UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JOE L. WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:17-cv-00114-JPH-DLP |
| ) | |
| SAMUEL BYRD, ) | |
| MARYANN CHAVEZ, ) | |
| BOBBY RIGGS, ) | |
| CORIZON HEALTH INC., ) | |
| ) | |
| Defendants. ) | |

## ENTRY GRANTING IN PART AND DENYING IN
## PART MOTION FOR SUMMARY JUDGMENT

This action is before the Court for resolution of Defendants' motion for

summary judgment. Dkt. [31]. For the reasons set forth below, the motion is

**granted in part** and **denied in part**.

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is

unnecessary because there is no genuine dispute as to any material fact and,

the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

Whether a party asserts that a fact is undisputed or genuinely disputed, the

party must support the asserted fact by citing to particular parts of the record,

including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A).

On summary judgment, a party must identify evidence that would

convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*,

814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II. Facts

Plaintiff Joe Williams is an inmate at Wabash Valley Correctional Facility (WVCF). On November 25, 2015, Plaintiff slipped and fell while working at his job in the prison's kitchen. Dkt. 23 at ¶ 10.[1] Plaintiff felt severe pain in his left knee and could not walk very well on his left leg. *Id.*

---

[1] Plaintiff's amended complaint, dkt. 23, "is the equivalent of an affidavit for summary judgment purposes" because he verified it under penalty of perjury. *See, e.g., Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013).

Twenty-three months later, the WVCF medical staff arranged for Plaintiff's knee to be examined by magnetic resonance imaging (MRI). The MRI revealed that Plaintiff's medial meniscus was frayed and that his anterior cruciate ligament (ACL) was torn. Dkt. 32-3 at 117. On November 12, 2017, Plaintiff underwent arthroscopic surgery to repair the torn meniscus and ACL. *Id.* at 135–138.

This lawsuit concerns the treatment Plaintiff received during the two years between his injury and his operation. Defendant Corizon Health, Inc. is a private entity that was contracted by the Indiana Department of Correction (IDOC) to provide medical treatment to inmates at WVCF. Defendants Samuel Byrd, Maryann Chavez, and Bobby Riggs were medical professionals employed by Corizon to treat inmates at WVCF. The action includes claims that Defendants Byrd, Chavez, and Riggs were deliberately indifferent to Plaintiff's serious medical needs in violation of his Eighth Amendment rights, that his rights were violated due to a Corizon custom or policy, and that he was injured by a breach of Corizon's contract with the IDOC.

## A. Previous Treatment for Knee Pain, Injury, and Initial Examinations by Nurses Klaiber and Riggs

Plaintiff had previously complained of and received treatment for pain in his left knee. *See id.* at 1–9. In May 2015, he received a cortisone injection in the knee. *Id.* at 5–8. In September 2015, he received a brace for the knee. *Id.* at 9.

Plaintiff injured his knee at work on November 25, 2015. The following day, he was examined by Nurse Rhonda Klaiber. *Id.* at 10–13. Nurse Klaiber's

notes document that Plaintiff's knee was swollen, that it hyperextended and locked, and that he experienced pain while walking that had worsened since the injury. *Id.* at 10–11. Her notes also document that Plaintiff had been treating the knee with ice and over-the-counter pain medications he obtained from the commissary but that his symptoms were not responding to that treatment. *Id.* at 11. Nurse Klaiber referred Plaintiff for an appointment with a physician and counseled him to immobilize the knee and apply ice and heat in the meantime. *Id.*

On November 30, 2015, Plaintiff was examined by Nurse Riggs. *Id.* at 14–17. Nurse Riggs documented that Plaintiff felt his knee "pop" at the time of his injury and that he was unable to work due to the pain. *Id.* at 14. Her notes also document that Plaintiff had been icing, elevating, and taking ibuprofen, but his condition had not improved since his visit with Nurse Klaiber. *Id.* at 15. Nurse Riggs described the knee as stable and found no swelling, bruising, or accumulation of fluid. *Id.* Plaintiff told Nurse Riggs he believed he had torn a ligament because he experienced so much pain when he put weight on his knee. Dkt. 38-1 at ¶ 2. However, Nurse Riggs characterized the injury as a sprain or strain. Dkt. 32-3 at 15. She counseled Plaintiff to continue icing and elevating the knee and provided him with an exercise plan. *Id.*

Plaintiff states that Nurse Riggs accused him during the November 30 examination of faking his injury. Dkt. 38-1 at ¶ 3. He adds that Nurse Riggs also told his supervisor in the kitchen that he was faking to get out of work and

he lost his job as a result. *Id.* Nurse Riggs disputes these allegations. Dkt. 32-4 at ¶ 7.

**B.    Initial Examinations by Drs. Rajoli and Byrd**

On December 16, 2015, Dr. Naveen Rajoli examined Plaintiff during a chronic care appointment. Dkt. 32-3 at 18–21. Dr. Rajoli found no swelling, determined that diagnostic imaging was not warranted, and advised Plaintiff to continue taking non-steroid anti-inflammatory drugs (NSAIDs) as needed for his knee pain. *Id.* at 18, 20.

On January 7, 2016, Dr. Byrd examined Plaintiff for the first time in response to Nurse Klaiber's referral six weeks earlier. *Id.* at 22–28. Dr. Byrd's treatment notes from the January 7 examination recount Plaintiff's description of his injury and the symptoms he experienced thereafter. Dr. Byrd described Plaintiff's knee pain as "sharp" and "throbbing" when he placed weight on the knee. *Id.* at 22. He further noted that Plaintiff experienced pain when standing, walking, ascending or descending stairs, kneeling, and going to recreation; and that he struggled to dress and put on shoes. *Id.* Plaintiff described sensations of grinding, popping, and catching and stated that his knee sometimes gave out. *Id.* Dr. Byrd observed a decreased range of motion in Plaintiff's knee and mild accumulation of fluid in the joint. *Id.* He ordered and reviewed x-rays, which did not show a dislocation or accumulation of fluid. *Id.*

Dr. Byrd's examination included a McMurray test, which Dr. Byrd explains is used to determine whether a patient has torn cartilage in the knee. Dkt. 32-2 at ¶ 11. Plaintiff's McMurray test was positive, suggesting he may

have had a torn meniscus. *Id.*; dkt. 32-3 at 22. Plaintiff states that Dr. Byrd informed him that his injury likely included a torn ligament. Dkt. 23 at ¶ 16.

Based on these observations, Dr. Byrd determined that Plaintiff should undergo an MRI. Dkt. 32-3 at 22. Dr. Byrd noted that he had seen Plaintiff in the past for complaints of knee pain "with much less impressive findings." *Id.* He suspected a "bucket-handle tear" in Plaintiff's meniscus, but, based on his training and experience, Dr. Byrd knew that torn cartilage is not visible on an x-ray. *Id.*; dkt. 32-2 at ¶ 12. Dr. Byrd requested authorization for an MRI and gave Plaintiff crutches and a 15-day supply of naproxen, a NSAID. Dkt. 32-3 at 22, 25, 27; Dkt. 32-2 at ¶ 11.

## C.     Denial of MRI, Physical Therapy, and Second Examination by Nurse Riggs

Although Dr. Byrd suspected that Plaintiff had a torn meniscus and knew that an MRI would be necessary to confirm the tear, he was not authorized to order an MRI. Dkt. 32-3 at 22-26. Rather, Dr. Byrd could only request that an MRI be arranged for Plaintiff, and his request required approval by a Corizon administrator. *Id.* at 29.

Dr. Byrd submitted his MRI request on January 15, 2016. *Id.* at 29–31. On January 21, Corizon denied the request. *Id.* at 32–34. The Corizon administrator determined that Plaintiff's injury could be treated adequately with physical therapy. *Id.*

Plaintiff completed physical therapy sessions on January 28 and February 15, 2016. *Id.* at 35–37. The physical therapist's notes indicate that

Plaintiff's symptoms did not improve as a result of the physical therapy. *Id.* at 37.

On February 23, 2016, Nurse Riggs again examined Plaintiff. *Id.* at 38–41. Plaintiff complained of constant pain and an inability to walk on his left leg. *Id.* at 38. Nurse Riggs noted that the knee was swollen and that his condition was not responding to the treatment he had been provided. *Id.* at 39. Accordingly, she stated she would refer Plaintiff for another appointment with a physician. *Id.* Plaintiff again completed physical therapy on March 21 and 31, 2016. *Id.* at 42–43. Records of these sessions document Plaintiff's impression that physical therapy was not helping his symptoms. *Id.*

**D.      Treatment by Dr. Chavez**

Dr. Chavez examined Plaintiff for the first time on June 22, 2016, during a chronic care appointment. Dkt. 32-3 at 45–50. This was Plaintiff's first meeting with a physician since his examination by Dr. Byrd more than five months earlier and four months after Nurse Riggs stated she would refer him for an appointment with a physician.

Dr. Chavez's notes from that examination do not show any improvement in Plaintiff's symptoms. *See id.* at 48. Dr. Chavez ordered and reviewed new x-rays, which revealed no changes from the x-rays Dr. Byrd reviewed five months earlier. *Id.* at 49–50. Moreover, Dr. Chavez noted that Plaintiff was no longer receiving physical therapy because the physical therapist was no longer coming to WVCF. *Id.* at 48. Dr. Chavez did not implement any other treatment.

Dr. Chavez examined Plaintiff for a second time on August 11, 2016. *Id.* at 51–54. Dr. Chavez's records from this examination do not document any improvement in Plaintiff's condition. *Id.* at 54. Plaintiff requested an MRI, but Dr. Chavez did not request one. *Id.*

During this examination, Dr. Chavez diagnosed Plaintiff with pes anserine bursitis, or inflammation of small fluid sacs surrounding the shin bone and tendons inside the knee. *Id.* at 54; dkt. 32-2 at ¶¶ 17–18. Dr. Byrd has attested that initial treatment for pes anserine bursitis includes rest, NSAIDS, and physical therapy. Dkt. 32-2 at ¶ 18. Dr. Chavez observed that Plaintiff was taking ibuprofen every day, and she prescribed him a ten-day supply of the steroid prednisone and counseled him to complete certain exercises. Dkt. 32-3 at 54.

Dr. Chavez examined Plaintiff for the third time during a chronic care appointment on September 21, 2016. *Id.* at 55–58. Dr. Chavez's notes from this appointment recognized that Plaintiff was completing the prescribed exercises but was still using crutches ten months after his injury. *Id.* at 58. Dr. Chavez's notes also include the phrase "? tear." *Id.* Defendants have not acknowledged this notation. Viewed in the light most favorable to Plaintiff, as it must on a motion for summary judgment, the Court reads this notation as potential evidence that Dr. Chavez questioned whether Plaintiff was suffering from a torn meniscus or ligament. Dr. Chavez also wrote "email to [illegible name] to schedule appointment." *Id.* However, there is no evidence that Dr. Chavez

requested an MRI or an appointment with a specialist or directed any other treatment following the September 21 examination.

Dr. Chavez again examined Plaintiff on September 29, 2016. *Id.* at 59–64. Dr. Chavez's notes from that examination do not indicate that Plaintiff's symptoms had improved. Rather, they document that his knee now became swollen after completing his prescribed exercises and that he experienced pain that awakened him in the middle of the night. *Id.* at 62. She prescribed naproxen based on Plaintiff's statement that it previously helped alleviate his swelling, although his pain persisted. *Id.* at 62, 64. *See id.* at 58, 64. Dr. Chavez noted that she would need to re-examine Plaintiff in two weeks. *Id.* at 64.

Four weeks later, Dr. Chavez again examined Plaintiff. *Id.* at 65–69. Dr. Chavez did not note any improvement in Plaintiff's symptoms. Rather, she observed that Plaintiff experienced pain and swelling when he stood. *Id.* at 68. In response, she substituted a cane for the crutches he had been using. *Id.* She also noted that she would write the WVCF superintendent to request a knee brace for Plaintiff. *Id.*

On November 2, 2016, Plaintiff requested a stronger brace for his knee. *Id.* at 71. On November 5, Plaintiff met with Nurse Ashley Swartzentruber. *Id.* at 72–74. Nurse Swartzentruber stated that only a physician could authorize a brace but that she would forward the request to a physician. *Id.* at 73–74.

Plaintiff met again with Dr. Chavez on November 16, 2016. *Id.* at 75–84. Dr. Chavez wrote in her records that the knee appeared normal. *Id.* at 76.

However, she also noted that Plaintiff continued to walk with a cane and experienced pain when standing and walking. *Id.* Dr. Chavez also noted that Plaintiff continued to perform the exercises she prescribed and that he now felt like the bones in his left knee were rubbing together during exercise. *Id.*

Dr. Chavez did not adjust Plaintiff's course of treatment based on the November 16 examination. Rather, she ordered new x-rays, which did not reveal any change, and renewed his prescription for naproxen because, although it did not decrease his pain, it did help control his swelling. *Id.* On November 17, Plaintiff received a new knee brace and said he would return his cane. *Id.* at 76, 82.

On December 1, 2016, Plaintiff reported that he was in severe pain and asked to have his cane back. *Id.* at 85. On December 3, he met with a nurse, who stated that she would refer him to a physician. *Id.* at 86–87. By December 7, Plaintiff still had not seen a doctor, and he submitted a second request for a cane. *Id.* at 88. Nurse Riggs responded on December 9 and stated only that Plaintiff had been scheduled to meet with a doctor. *Id.* On December 21, 2016, Plaintiff received a new knee brace, (*id.* at 89–90) but still had not met with a doctor.

On January 3, 2017, Plaintiff met with Dr. Chavez for a chronic care appointment. *Id.* at 92–98. Dr. Chavez noted that Plaintiff's knee had "no stability" and ordered him a smaller brace, which he received three weeks later. *Id.* at 95–97. She also found that naproxen was not treating Plaintiff's

symptoms effectively and discontinued his prescription. *Id.* at 95, 98. Dr. Chavez did not prescribe any other treatment for Plaintiff.

Plaintiff met with Dr. Chavez for another chronic care appointment on April 5, 2017. *Id.* at 99–102. Although Plaintiff received treatment for his knee injury at previous chronic care appointments, Dr. Chavez's records of this appointment include no notes about Plaintiff's knee condition and indicate that she took no action to treat Plaintiff's knee during this appointment. *Compare id. to* dkt. 32-3 at 45–50, 55–58, 92–98.

### E.  Second Examination by Dr. Byrd, MRI, and Surgery

On August 29, 2017, Dr. Byrd examined Plaintiff during a chronic care appointment. *Id.* at 107–110. Dr. Byrd's notes from this appointment include a thorough review of the treatment Plaintiff received for this injury. *Id.* at 107–108.

Dr. Byrd noted that his first examination of Plaintiff nearly 20 months earlier was "consistent with an acute medial meniscal tear." *Id.* at 107. Dr. Byrd reiterated his suspicion that Plaintiff sustained a bucket-handle tear of the meniscus and noted that his request for an MRI was denied in favor of an alternative treatment plan grounded in physical therapy. *Id.*  He noted, however, that Plaintiff stopped receiving physical therapy after the prison's physical therapist resigned. *Id.* He also remarked that Plaintiff's first two physical therapy sessions resulted in "modest improvement at best" and that he showed "no improvement" after three visits. *Id.*

Dr. Byrd also reviewed Dr. Chavez's treatment, including the two x-rays she ordered and her prescription for naproxen, which he observed was "ineffective." *Id.* Dr. Byrd noted that Plaintiff stated that Dr. Chavez said at one point that she would order an MRI but that he found no supporting documentation to that effect. *Id.*

At this appointment, Plaintiff reported some decrease in his pain, although he believed that this was "only because he just lays in his bunk and stays off his knee." *Id.* at 107–108. Dr. Byrd noted that Plaintiff no longer went to recreation and that he could not stand longer than fifteen minutes without experiencing severe pain. *Id.* at 108.

Dr. Byrd diagnosed Plaintiff with an "unspecified derangement of [his] medial meniscus." *Id.* at 109. Accordingly, he again requested an MRI to determine whether surgery was necessary to treat the injury. *Id.* Dr. Byrd found that an orthopedist would "undoubtedly" request an MRI to evaluate Plaintiff's knee based on his examination. *Id.*

On September 22, 2017, Dr. Byrd requested an MRI. *Id.* at 111–114. The request was approved on September 26. *Id.* at 113. The MRI was completed on October 11, 2017—more than 22 months after Plaintiff first sought treatment for his knee injury. *Id.* at 115.

Plaintiff's MRI revealed a chronic, full-thickness tear of his ACL and free-edge fraying of his medial meniscus. *Id.* at 116–117. By November 1, 2017, Plaintiff had not been notified of the results, so he went to sick call seeking an update. *Id.* at 118–119. Dr. Byrd met with Plaintiff to discuss the MRI results

on November 14, 2017 and determined he would refer Plaintiff to an orthopedist. *Id.* at 120–123. Dr. Byrd placed that request on November 22, 2018. *Id.* at 124–127.

Plaintiff met with an orthopedist on December 18, 2017, and Dr. Byrd requested authorization for surgery the following day. *Id.* at 128–134. The request was approved, and Plaintiff underwent arthroscopic surgery on January 12, 2018. *Id.* at 135–138. As Dr. Byrd suspected two years earlier, the surgeon found a bucket-handle tear of the medial meniscus that was "nontreatable" and "irreducible." *Id.* at 137. The surgeon stated that surgery was "required treatment" for this meniscal injury. *Id.* He found the ACL to be "incompetent" and "completely torn." *Id.*

### III. Analysis

This action includes claims that Defendants Byrd, Chavez, and Riggs were deliberately indifferent to Plaintiff's serious medical needs in violation of his Eighth Amendment rights; that his rights were violated due to a Corizon custom or policy; and that he was injured by a breach of Corizon's contract with the IDOC. For the reasons set forth below, Defendants' motion for summary judgment is **granted** as to Plaintiff's claims against Dr. Byrd and **denied** as to Dr. Chavez, Nurse Riggs, and Corizon.

### A.  The Eighth Amendment and Deliberate Indifference

Under the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive

adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotations omitted). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

"A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). A delay in treatment that causes unnecessary pain is actionable even if it did not exacerbate the injury or diminish the chances of a full recovery. *See Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012) (holding that the plaintiff stated an Eighth Amendment claim because "even though this [four-day] delay [in treatment] did not exacerbate [the plaintiff's] injury, he experienced prolonged, unnecessary pain as a result of a readily treatable condition"); *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain."). "Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference." *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). With respect to all of Plaintiff's claims, there is no dispute as to whether he had an objectively serious medical condition, so the Court's analysis focuses on each defendant's knowledge of Plaintiff's condition and the degree of risk of harm it presented.

## B.   Dr. Byrd

While Plaintiff may disagree with the course of treatment provided by Dr. Byrd, no trier of fact could reasonably conclude that Dr. Byrd was deliberately indifferent to Plaintiff's knee injury.

Dr. Byrd first examined Plaintiff on January 7, 2016. There is no evidence that indicates that Dr. Byrd knew or should have known of Plaintiff's knee injury before that examination. Further, there is no evidence that Dr. Byrd was responsible for scheduling an appointment with Plaintiff based on his previous visits with nurses or with Dr. Rajoli or the health care requests he submitted. As such, a reasonable fact finder could not find Dr. Byrd responsible for the delay between Plaintiff's injury and his first appointment with Dr. Byrd.

Dr. Byrd's first examination of Plaintiff was thorough. His treatment notes include a detailed record of Plaintiff's symptoms. Those symptoms led Dr. Byrd to suspect a torn meniscus. Dr. Byrd performed a McMurray test based on that suspicion and then requested an MRI after the McMurray test was positive. While Plaintiff did not receive the MRI until almost two years later, Dr. Byrd did not have the authority to arrange an MRI for a patient without approval by a Corizon administrator.

After the MRI request was denied, Dr. Byrd was not involved in Plaintiff's treatment until August 2017. The evidence before the Court does not indicate that this was because Dr. Byrd ignored Plaintiff. Rather, it was because Plaintiff was receiving treatment from a different doctor.

When Dr. Byrd again examined Plaintiff in August 2017, he reviewed Plaintiff's treatment history and the progression of his symptoms. Based on that information, he again requested an MRI, which confirmed his initial suspicion. He then entered requests for Plaintiff to meet with a surgeon and have his knee surgically repaired.

Viewing the facts in a light most favorable to Plaintiff, there were two somewhat lengthy delays in Plaintiff's treatment that involved Dr. Byrd: approximately three weeks between the August 2017 examination and Dr. Byrd's submission of the second request for an MRI and a month between the MRI being done and Dr. Byrd's meeting with Plaintiff to discuss the results. These delays, however, do not support a finding of deliberate indifference. A reviewing court "must examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999) (quoting *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 591 (7th Cir. 1999)). The record demonstrates that Dr. Byrd exercised medical judgment in treating Plaintiff and that, viewed as a whole, the treatment was responsive and timely.

Plaintiff also criticizes Dr. Byrd for not prescribing a stronger pain medication, providing ice, or authorizing a medical "lay-in"—or permission to receive meals in his cell rather than walk to the dining facility for meals—following his initial examination. This, however, does not demonstrate deliberate indifference. Dr. Byrd considered Plaintiff's condition, exercised his medical judgment, and provided treatment—including naproxen (a pain reliever

that Plaintiff had not yet taken for this injury), crutches (to help Plaintiff walk to the dining facility), and a request for an MRI. That Plaintiff would have preferred a different course, or even that a different doctor might have provided a different course, does not render Dr. Byrd's treatment deliberately indifferent. *Pyles*, 771 F.3d at 409.

The record demonstrates that Dr. Byrd was attentive to Plaintiff's condition and applied medical judgment in response. As such, he is entitled to judgment as a matter of law. Defendants' motion for summary judgment is **granted** as to Dr. Byrd.

## C.     **Dr. Chavez**

Dr. Chavez met with Plaintiff eight times in a span of roughly ten months. Dr. Chavez's treatment notes do not indicate any improvement in Plaintiff's symptoms in that time but that some symptoms worsened. For example, by the fourth appointment, Plaintiff reported that his knee no longer hurt only when he stood or walked, but that it began waking him up in the middle of the night and swelling after he completed his recommended exercises. *See* dkt. 32-3 at 67.

Dr. Chavez's treatment of Plaintiff's injury did not progress with his worsening symptoms. Early in their relationship, Dr. Chavez diagnosed Plaintiff with pes anserine bursitis and determined that a conservative course of treatment was appropriate. She provided an exercise plan for Plaintiff to follow and gave him a ten-day supply of prednisone. Eventually, she prescribed naproxen to control swelling despite acknowledging that it did not mitigate

Plaintiff's pain, and that prescription was eventually discontinued. Dr. Chavez also caused Plaintiff to put additional weight on his knew after she provided a leg brace to replace the crutches and cane. And at their final appointment, Dr. Chavez did not even address Plaintiff's knee injury.

Deliberate indifference may be found "where a prison official persists in a course of treatment known to be ineffective." *Petties v. Carter*, 836 F.3d 722, 730–731 (7th Cir. 2016). "[M]edical personnel cannot simply resort to an easier course of treatment that they know is ineffective." *Id.* at 731. Dr. Chavez's notes show that the exercises and medications were not effective; that the x-rays showed no change in his condition (and, in any event, they were not capable of depicting ligaments or cartilage); that Plaintiff's symptoms did not improve; and notes from the final chronic care appointment do not address the knee injury at all. This evidence could support a finding of deliberate indifference.

Defendants argue that Dr. Chavez's treatment plan was appropriate for her diagnosis of pes anserine bursitis. This argument fails, however, because a reasonable trier of fact could find that Dr. Chavez suspected Plaintiff was suffering from conditions in addition to pes anserine bursitis. Her own treatment notes indicate that she believed that Plaintiff may have suffered a tear and that a different course of treatment may have been warranted. *See* dkt. 32-3 at 58, 64. Moreover, a finder of fact could conclude that the course of treatment Dr. Chavez provided was not appropriate care. According to Defendants, even conservative treatment for pes anserine bursitis includes

physical therapy, Dkt. 32-2 at ¶ 18, but Dr. Chavez knew from her first appointment with Plaintiff that his physical therapy had been discontinue and never resumed. *See* dkt. 32-3 at 48.

Finally, a reasonable trier of fact could find that Dr. Chavez failed to adjust her treatment for pes anserine bursitis after that plan proved ineffective. Dr. Chavez treated Plaintiff for eight months after diagnosing him with pes anserine bursitis, and considerable evidence shows that his condition did not improve by that time. There is sufficient evidence to support a finding of deliberate indifference. Therefore, Defendants' motion for summary judgment is **denied** as to Dr. Chavez.

**D.    Nurse Riggs**

A reasonable trier of fact also could find that Nurse Riggs was deliberately indifferent to Plaintiff's knee injury. The crux of Defendants' argument for Nurse Riggs is that the range of treatment she was permitted to provide as a nurse (as compared to a doctor) was limited and that she acted appropriately within those parameters. However, viewed in the light most favorable to Plaintiff as the non-movant, a reasonable trier of fact could conclude that she was deliberately indifferent to Plaintiff's condition.

Plaintiff first met with Nurse Riggs five days after his injury. Defendants assert that Nurse Riggs acted appropriately by providing Plaintiff with some exercises and counseling him to rest, ice, elevate, and apply compression to his knee, but they also acknowledge Plaintiff reported he was already taking those measures and that he continued to experience serious pain when he put weight

on his knee. Nurse Riggs may have learned this from reviewing Nurse Klaiber's notes from November 26, 2015. *See* dkt. 32-3 at 10–11 (noting that symptoms had not responded to ice and over-the-counter medications). Plaintiff did not receive crutches or any other assistive device until after he met with Dr. Byrd on January 7, 2016, even though he had to walk two city blocks three times per day to get his meals. *See* dkt. 38-1 at ¶ 7. Nurse Riggs also states that Nurse Klaiber had already scheduled Plaintiff for a doctor's appointment following the November 26 appointment, so there was no need for her to refer him to a physician following their first appointment on November 30. Dkt. 32-4 at ¶ 7. A trier of fact could infer, however, that Nurse Riggs knew that Plaintiff would not see a doctor until his December 16 chronic care appointment with Dr. Rajoli or his January 7 appointment with Dr. Byrd and did not take any action to ensure that Mr. Riggs could receive crutches or another assistive device sooner.

There is no evidence whether Nurse Riggs had authority to provide a patient with crutches without approval by a doctor. Whether Nurse Riggs could have done something on November 30 to address Plaintiff's pain and suffering is therefore an unresolved fact. Moreover, Plaintiff's allegation that Nurse Riggs accused Plaintiff of faking his injury weakens the inference that she did all she could and strengthens the inference that she declined to assist Plaintiff because she was either willfully ignorant of or dismissively hostile toward his complaints.

Defendants also assert that Nurse Riggs acted appropriately by referring Plaintiff to meet with a physician following their meeting on February 23, 2016. However, the evidence Defendants have presented raises questions of fact on this issue. Nurse Riggs wrote in her February 23 treatment notes that she *would* refer Plaintiff to a physician for treatment. Dkt. 32-3 at 39. Plaintiff's next meeting with a physician did not occur until June 22—four months later—at a chronic care appointment with Dr. Chavez. *Id.* at 45–50. Similarly, Nurse Riggs stated on December 9, 2016, in response to a health care request, that Plaintiff was scheduled to meet with a doctor. *Id.* at 88. However, he next met with a physician for a chronic care appointment on January 3, 2017. *Id.* at 92–98. These delays raise material questions of fact as to whether Nurse Riggs took action to arrange appointments with physicians.

Taken together, this evidence could allow a trier of fact to conclude that Nurse Riggs was capable of aiding Plaintiff but consciously disregarded his complaints. Therefore, Defendants' motion for summary judgment is **denied** as to Nurse Riggs.

## E. Corizon

Plaintiff asserts two claims against Corizon. First, he seeks damages through 42 U.S.C. § 1983 on the theory that the Eighth Amendment claims described above resulted from Corizon policies or customs. Second, he seeks damages under Indiana law on the theory that he is a third-party beneficiary of Corizon's contract with the IDOC and that the course of medical care described above breached the terms of that contract in a manner that injured him. For

the reasons explained below, Defendants are not entitled to summary judgment on either claim.

### 1. Eighth Amendment Policy or Custom Claim

Because Corizon acted under color of state law by contracting to perform a government function—providing medical care to state correctional facilities—Corizon is treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002). To prevail, Plaintiff must show that Corizon had: (1) an express policy that, when enforced, caused a constitutional deprivation; (2) a practice so widespread that, although not authorized by written or express policy, was so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that his constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758-759 (7th Cir. 2004). In addition, the failure to make policy itself may be actionable conduct. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).

"To prove an official policy, custom, or practice," a plaintiff must rely on more than the plaintiff's personal experiences. *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016). Instead, a plaintiff can establish a general policy or practice by offering "competent evidence tending to show a general pattern of repeated behavior." *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006).

Plaintiff has satisfied this standard by offering evidence from which the trier of fact could find that Corizon had constructive knowledge of constitutional violations and chose to do nothing as a policy. In *Hunt v. Byrd*, a

different plaintiff made similar allegations to the claims brought by Plaintiff against some of the same Corizon personnel. Dkt. 38, p. 18-19. Also, Plaintiff has proffered several newspaper articles detailing how deficiencies in Corizon's policies may have led to prisoner injuries or even death. Dkt. 38-2, pp. 6-13. This evidence could support a finding that Corizon had constructive knowledge of a pattern of inadequate medical attention given to inmates under its care. *See King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (denying the defendants' summary judgment motion on a plaintiff's claim of inadequate medical care after considering newspaper articles that expressed alarm over the defendant's medical policies.).

Defendants argue that this evidence is only hearsay and does not amount to any "evidence of any actual wrongdoing." Dkt. 39 at 10. But the *Hunt* docket and newspaper articles may be considered for the non-hearsay purpose of establishing Corizon's prior knowledge regarding possible problems in its medical-care policies. *See Daniel*, 833 F.3d at 735–36 (holding that the lower court correctly held that a report from the Justice Department about deficiencies in the defendant's medical care could be considered for the non-hearsay purpose of proving the defendant knew of the problems). This evidence is enough to create a genuine issue of material fact as to whether Corizon had a policy that caused a constitutional deprivation. Therefore, Defendants' motion for summary judgment is **denied** as to Plaintiff's Eighth Amendment claim against Corizon.

### 2. Breach of Contract Claim

Defendants deny without any citation to law or to the contract itself that Plaintiff was not a third-party beneficiary of Corizon's contract with the IDOC and that, in any event, there was no breach of the contract because he was afforded proper medical care. There is no dispute that this contract exists; Defendants simply have not explained why Plaintiff is not entitled to its protections or how they satisfied their obligations under it. The Court cannot determine from the record before it that Plaintiff was not a third-party beneficiary of the contract or that the treatment that he received satisfied the contract's terms.

Alternatively, Defendants ask the Court to decline to exercise supplemental jurisdiction over this state-law claim. However, this request relies on the condition precedent that the Court grant summary judgment on all the remaining claims. Whereas Plaintiff's Eighth Amendment claims against Dr. Chavez, Nurse Riggs, and Corizon will continue, this argument has no merit. Defendants' motion for summary judgment is **denied** as to Plaintiff's breach of contract claim against Corizon.

### IV. Conclusion

Defendants' motion for summary judgment, dkt. [31], is **granted** as to Dr. Byrd and **denied** as to all other defendants. No partial final judgment shall issue at this time. However, the **clerk is directed** to terminate Dr. Byrd as a party on the docket. The Court will issue a separate Order directing further proceedings in this action.

**SO ORDERED.**

Date: 1/30/2019

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

JOE L. WILLIAMS
150374
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Jeb Adam Crandall
BLEEKE DILLON  CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com